UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

MICHAEL PAUL TEBAULT,                                                                    Plaintiff,

v.                                                                        Civil Action No. 3:23-cv-560-DJH-RSE

UNITED STATES OF AMERICA,                                                             Defendant.

\* \* \* \* \*

**MEMORANDUM OPINION AND ORDER**

Plaintiff Michael Paul Tebault filed this action against the United States of America, asserting two counts of negligence after he and his counselor at a Veterans Affairs therapy program engaged in a sexual relationship.  (Docket No. 13, PageID.101–02)  The United States now moves to dismiss Tebault's amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  (D.N. 17)  The government argues that the Court lacks subject-matter jurisdiction under the Federal Tort Claims Act (FTCA) and contends that Tebault has failed to exhaust his administrative remedies.  (*Id.*, PageID.114–31)  Tebault opposes the motion.  (D.N. 20)  For the reasons set forth below, the Court will grant the government's motion to dismiss.

**I.**

The following facts are set forth in the amended complaint and accepted as true for purposes of the present motion.  *Siefert v. Hamilton Cnty.*, 951 F.3d 753, 757 (6th Cir. 2020) (citing Fed. R. Civ. P. 12(b)(6)).  Tebault was in the United States Army from 2000 to 2006 and was deployed to Iraq for a period of that time.  (D.N. 13, PageID.98 ¶ 5)  After leaving the Army, he developed a substance-abuse disorder and "developed or had developed one or more mental and emotional illnesses or disturbances, including post-traumatic stress disorder (PTSD)."  (*Id.* ¶ 6)

After his separation from service, he began receiving medical care at the VA Medical Center. (*Id.* ¶ 8) He received treatment for his substance-abuse disorder and PTSD at VAMC. (*Id.*)

In 2021, Tebault "began receiving treatment at a central Kentucky equine therapy program operated by the VA." (*Id.* ¶ 9) There, he received treatment and counseling from Abigail Dawkins, a licensed social worker. (*Id.* ¶ 10) Dawkins "took an inappropriate interest" in Tebault during the therapy program. (*Id.*) She "frequently contacted him outside their treatment and counseling sessions," flirted with him, and eventually pursued a romantic, intimate, and physical relationship with him. (*Id.*, PageID.98–99 ¶¶ 10–11) According to Tebault, "Dawkins emotionally and psychologically preyed" on him while he was "in a vulnerable state" and "manipulated him to believe they were in a genuine romantic relationship." (D.N. 13, PageID.99 ¶ 12)

As a result of this relationship, Tebault "neglect[ed] his health and well[-]being." (*Id.* ¶ 13) "He stopped taking prescribed medications and began missing scheduled appointments with his medical providers." (*Id.*) His "substance use [also] escalated." (*Id.* ¶ 14) When Dawkins ended the relationship with Tebault, Tebault "fe[lt] depressed and abandoned," "began using methamphetamine regularly," and "increasingly contemplated committing suicide." (*Id.* ¶ 16) He attempted to commit suicide in January 2022. (*Id.* ¶ 17)

The VA eventually terminated Dawkins's employment after Tebault filed a complaint with the VAMC, and the Administrative Investigation Board (AIB) investigated Dawkins's actions. (*Id.*, PageID.101 ¶ 25; D.N. 17-1) Tebault then sued the government, alleging two counts of negligence. (D.N. 13) First, he alleges that government "employees, agents, and representatives" were negligent by "fail[ing] to satisfy [the government's] duty to provide proper and appropriate medical care to [Tebault]." (*Id.*, PageID.101 ¶ 28) Count I includes negligence for the government's failure to train, monitor, and terminate Dawkins's employment, its failure to

2

"safeguard [Tebault] from Dawkins in light of her known and documented predatory behavior," and its "failure to adequately evaluate and treat" Tebault and prevent his suicide attempt. (*Id.*, PageID.101–02) Second, he alleges that Dawkins breached her duty to Tebault to provide "care in compliance with the medical and professional standards applicable to Dawkins" by initiating and engaging in a romantic and inappropriate relationship with Tebault. (*Id.*, PageID.102 ¶ 31) The government moves to dismiss pursuant to Rules 12(b)(1) and 12(b)(6). (D.N. 17)

## II.

### A.      Materials Outside the Pleadings

Generally, courts may consider only the factual allegations in the pleadings when deciding a Rule 12(b)(6) motion to dismiss. *Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 483 (6th Cir. 2020). If matters outside the pleadings are presented on a motion to dismiss and not expressly excluded by the Court, the Court must treat the motion to dismiss as a motion for summary judgment under Rule 56. Fed. R. Civ. P. 12(d); *see also Bates*, 958 F.3d at 483. There are a few exceptions, however: courts may consider documents attached to the complaint, documents attached to the defendant's motion to dismiss "so long as they are referred to in the complaint and are central to the claims contained therein," and public records without converting the motion to a motion for summary judgment. *Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 681 (6th Cir. 2011). But "[u]nlike a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court need not convert a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) into one for summary judgment when materials outside the pleadings are considered." *Johnson v. Bredesen*, 356 F. App'x 781, 783 (6th Cir. 2009) (citing *Rogers v. Stratton Industries, Inc.*, 798 F.2d 913, 916 (6th Cir. 1986)). "[A] court may consider affidavits and other documents outside the record on a Rule 12(b)(1) motion, but it must do so in a manner that is fair to the non-moving

party." *See Hatcher v. United States*, 512 F. App'x 527, 528 (6th Cir. 2013) (citing *Rogers*, 798 F.2d at 916).

Here, the government has attached outside-the-pleadings material to its motion to dismiss, including Tebault's SF-95 form,[1] Tebault's sworn testimony before the AIB, and the AIB's findings. (D.N. 17-1; D.N. 17-2; D.N. 17-3) Tebault also submitted his SF-95 form with his response. (D.N. 20-1) SF-95 forms have been held to be public records, and therefore, the Court may consider Tebault's SF-95 form on either a 12(b)(6) motion or a 12(b)(1) motion. *See L.C. v. United States*, No. 5:21-cv-00124-GFVT, 2022 U.S. Dist. LEXIS 72348, *23 n.5 (E.D. Ky. Apr. 19) (collecting cases). The sworn testimony before the AIB and the AIB's findings, however, may be considered only on a Rule 12(b)(1) motion, not a Rule 12(b)(6) motion. *Hatcher*, 512 F. App'x at 528. Here, the Court considers only Tebault's testimony before the AIB and his SF-95 form on the Rule 12(b)(1) motion, and it does not consider the AIB's findings. (D.N. 17-2) Considering the testimony before the AIB would be "fair" to Tebault because he "was free to supplement the record by affidavits[] but chose not to do so," *Hatcher*, 512 F. App'x at 528, and the amended complaint refers to the AIB investigation. (D.N. 13, PageID.101 ¶ 25) The Court will therefore consider Tebault's AIB testimony and SF-95 form on the Rule 12(b)(1) motion, and it will consider only the SF-95 form on the Rule 12(b)(6) motion. *See id.*; *Newman v. Univ. of Dayton*, 751 F. App'x 809, 812 (6th Cir. 2018).

---

[1] An "SF 95 is provided by the government as a 'convenient format for supplying the information necessary to bring an FTCA claim.'" *Copen v. United States*, 3 F.4th 875, 878 (6th Cir. 2021) (quoting Dep't of Justice, Documents and Forms, https://www.justice.gov/civil/documents-and-forms-0 (last visited May 19, 2021)). But an SF-95 form "is not itself required to initiate an FTCA claim." *Id.* at 883.

**B.     Subject-Matter Jurisdiction**

The Court must "consider the 12(b)(1) motion first, since the Rule 12(b)(6) challenge becomes moot if [the] court lacks subject matter jurisdiction." *Houchens v. Beshear*, 850 F. App'x 340 (6th Cir. 2021). "Where subject[-]matter jurisdiction is challenged pursuant to Rule 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the motion." *Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990). Rule 12(b)(1) motions can make facial or factual attacks on subject-matter jurisdiction. *Howard v. City of Detroit*, 40 F.4th 417, 422 (6th Cir. 2022). Facial attacks challenge the sufficiency of the pleading, whereas factual attacks challenge the facts in the pleading. *Gentek Bldg. Prods. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). For this reason, when district courts review facial attacks, they take the facts in the complaint as true, but the same presumption of truth does not apply to factual attacks. *Id.* Here, the government's motion makes a facial attack because it does not question the facts in Tebault's pleading. (*See generally* D.N. 19) The Court therefore takes the facts in the complaint as true. *See id.*

The government argues that the Court lacks subject-matter jurisdiction over this case because the FTCA does not waive sovereign immunity for the torts alleged by Tebault. (D.N. 19, PageID.216) The United States and its agencies maintain sovereign immunity from suit unless Congress expressly waives that immunity by statute and consents to be sued. *FDIC v. Meyer*, 510 U.S. 471, 475 (1994); *United States v. Sherwood*, 312 U.S. 584, 586 (1941). Congress enacted the FTCA "primarily to remove the sovereign immunity of the United States from suits in tort." *Mynatt v. United States*, 45 F.4th 889, 894 (6th Cir. 2022) (quoting *Millbrook v. United States*, 569 U.S. 50, 52 (2013)). The Act "waives sovereign immunity for claims of 'injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any

5

employee of the [United States] while acting within the scope of his office or employment.'" *Id.* at 894–95 (quoting 28 U.S.C. § 1346(b)(1)). Therefore, "[t]o fall within the FTCA, 'the [alleged] negligent or wrongful act or omission' must have occurred while the employee was 'acting within the scope of h[er] office or employment.'" *Stout v. United States*, 721 F. App'x 462, 472 (6th Cir. 2018) (quoting 28 U.S.C. § 1346(b)(1)).

Tebault alleges two categories of conduct in the complaint. The first is a claim for negligent training, supervision, and retention of Dawkins.[2] (D.N. 13, PageID.101–02) The second is negligence for the treatment Tebault received, including the government's failure to adequately evaluate and treat Tebault and prevent his suicide attempt, and Dawkins's failure to provide "care in compliance with [applicable] medical and professional standards" by initiating or engaging in an inappropriate relationship with Tebault. (*Id.*, PageID.102) The Court will address each category in turn.

1. **Negligent Training, Supervision, and Retention**

The Sixth Circuit "has consistently held that agency supervisory and hiring decisions fall within the discretionary function exception." *Snyder v. United States*, 590 F. App'x 505, 510 (6th Cir. 2014). Pursuant to this exception, the FTCA does not waive immunity for injuries "based upon the exercise or performance or the failure to exercise or perform a discretionary function."

---

[2] In Count I, Tebault asserts that "Defendant's employees, agents, and representatives failed to satisfy Defendant's duty to provide proper and appropriate medical care to [Tebault] and thus were negligent." (D.N. 13, PageID.101) Within this count, he also alleges that the government failed to train, monitor, and terminate Dawkins and that the government failed "to safeguard [Tebault] from Dawkins in light of her known and documented predatory behavior." (*Id.*) The Court construes these claims under Count I as claims for negligent training, supervision, and retention. *See Stout*, 721 F. App'x at 467 (construing a claim that several employees "were incompetent in their job duties" as a claim for negligent hiring, supervision, and retention). The parties likewise construed the claims this way. (*See* D.N. 17, PageID.119; D.N. 20, PageID.332–33) The remainder of the claims under Count I relate to Tebault's treatment and thus will be analyzed separately. (*See* D.N. 13, PageID.101–02)

6

28 U.S.C. § 2680(a).  Courts apply a two-part test to determine whether the discretionary-function exception applies.  First, the court must determine "whether the challenged act or omission violated a mandatory regulation or policy that allowed no judgment or choice."  *Kohl v. United States*, 699 F.3d 935, 940 (6th Cir. 2012).  And second, the court must "evaluate whether the conduct is of the kind that the discretionary function exception was designed to shield from liability."  *Id.*

The Sixth Circuit has reasoned that "supervision, training, and retention require policy judgments—the type that Congress intended to shield from tort liability."  *Id.* at 510.  For instance, in *Snyder*, the Sixth Circuit held that the court lacked subject-matter jurisdiction over claims against the Federal Bureau of Investigation for negligent hiring, training, supervision, and retention.  590 F. App'x at 510.  The court reasoned that such actions involved judgment and discretion, and the plaintiff "point[ed] to no specific regulations that would constrain the judgment exercised in making these decisions."  *Id.*; *see also Stout*, 721 F. App'x at 467 ("[N]egligent hiring, retention, and supervision claims in connection with an intentional tort are deemed to arise out of that tort[] and are thus precluded.").

Here, Tebault has not alleged that the government's training, supervision, or retention of Dawkins "violated a mandatory regulation or policy that allowed no judgment or choice."  *Rosebush v. United States*, 119 F.3d 438, 441 (6th Cir. 1997).  Because Tebault "failed to allege the United States' nonconformance with any applicable regulations," the first prong of the test is not met.  *Snyder*, 590 F. App'x at 510.  And given that the Sixth Circuit has held that supervision, training, and retention decisions involve discretion intended to be protected by the FTCA, the Court lacks subject-matter jurisdiction over these claims.[3]  *Id.*

---

[3] Although the government does not make a subject-matter jurisdiction argument as to the negligent training, supervision, and retention claims (*see* D.N. 17), the Court has an "independent

7

### 2. Negligent Treatment

The government argues that the FTCA does not waive sovereign immunity here because Dawkins was not acting within the scope of her employment when she engaged in a sexual relationship with Tebault. (D.N. 17, PageID.120–32). An employee must have been "acting within the scope of h[er] office or employment" during the commission of a negligent or wrongful act for a claim to fall within the FTCA's waiver of sovereign immunity. *Stout*, 721 F. App'x at 472 (quoting 28 U.S.C. § 1346(b)(1)). Whether a wrongful or negligent act is within an individual's scope of employment "is governed by the law of the state in which the conduct at issue occurred." *Id.* (quoting *Coleman v. United States*, 91 F.3d 820, 823 (6th Cir. 1996)). In Kentucky, for an act "to be within [an employee's] scope of employment, 'the conduct must be of the same general nature as that authorized or incidental to the conduct authorized.'"[4] *O'Bryan v. Holy See*, 556 F.3d 361, 383 (6th Cir. 2009) (quoting *Osborne v. Payne*, 31 S.W.3d 911, 915 (Ky. 2000)). The analysis focuses on "whether the employee or agent was acting within the scope of h[er] employment at the time of h[er] tortious act." *Osborne*, 31 S.W.3d at 915. Kentucky courts consider the following factors to determine whether an employee's conduct was within the scope of their employment:

> (1) whether the conduct was similar to that which the employee was hired to perform; (2) whether the action occurred substantially within the authorized spatial and temporal limits of the employment; (3) whether the action was in furtherance of the employer's business; and (4) whether the conduct, though unauthorized, was expectable in view of the employee's duties.

---

obligation to ensure that subject matter jurisdiction exists." *Valinski v. Edison*, 197 F. App'x 403, 405 (6th Cir. 2006) (citing *Olden v. LaFarge Corp.*, 383 F.3d 495, 498 (6th Cir. 2004)).
[4] The parties here agree that Kentucky law applies because the alleged conduct by Dawkins occurred in Kentucky. (D.N. 19, PageID.218)

*McMullan v. United States*, No. 17-5463, 2017 U.S. App. LEXIS 25273, at *6 (6th Cir. Dec. 13, 2017) (quoting *Coleman*, 91 F.3d at 824). "Kentucky courts focus on the intent of the employee in making scope-of-employment determinations." *Id.*

Tebault argues that Dawkins acted within the scope of her employment by "negligently mishandl[ing] a psychological pheno[menon] called transference." (D.N. 20, PageID.335) According to Tebault, "[t]ransference occurs when, by virtue of the trusting relationship between patient and counselor, the patient begins to experience an attachment to the counselor that mirrors the parent-child relationship." (*Id.*) In support, Tebault cites *Simmons v. United States*, 805 F.2d 1363 (9th Cir. 1996), and *Benavidez v. United States*, 177 F.3d 927 (10th Cir. 1999). In *Simmons*, the Ninth Circuit found that a therapist's sexual relationship with a patient was within the scope of their employment on the ground that

> a sexual relationship between therapist and patient cannot be viewed separately from the therapeutic relationship that has developed between them. The transference phenomenon makes it impossible that the patient will have the same emotional response to sexual contact with the therapist that he or she would have to sexual contact with other persons. Further, by introducing sexual activity into the relationship, the therapist runs the risk of causing additional psychological damage to the patient.

*Id*. at 1370 (quoting *L.L. v. Med. Protective Co.*, 362 N.W.2d 174, 178 (Wis. Ct. App. 1984)). But *Simmons* is distinguishable because the sexual relationship there began while the therapist was counseling the patient. 805 F.2d at 1364. Here, Tebault and Dawkins's relationship began after the therapy program ended. (D.N. 17-2, PageID.144) *Benavidez* is likewise inapposite. Not only did the sexual relationship at issue in that case also begin during the counseling, but the Tenth Circuit "assume[d]" without deciding, "that [the counselor] acted within the course and scope of his employment as a government psychologist." *Benavidez*, 177 F.3d at 928 n.2.

9

Moreover, while is true that some courts have found a counselor's sexual relationship with a patient to be within the scope of their employment when the counselor mismanaged transference, other courts considering the issue have found the opposite. *See, e.g.*, *Block v. Gomez*, 549 N.W.2d 783, 785 (Wis. Ct. App. 1996) ("We reject [the patient's] contention that the 'transference phenomenon' makes [the counselor's] sexual relationship with [the patient] inseparable from his therapeutic relationship with [the patient] for purposes of the Clinic's vicarious liability. Therapist–patient sex arises not out of the transference, which is essential to the therapy, but the intentional abuse of the transference."); *see also Bodin v. Vagshenian*, 462 F.3d 481, 487 (5th Cir. 2006) (finding that a psychiatrist's sexual assault of a patient was not within the scope of their employment, rejecting the applicability of *Simmons* and *Benavidez*).

In any event, Kentucky courts have never applied this phenomenon,[5] and Kentucky case law "strongly suggests" that a counselor's sexual relationship with a patient is outside the scope of their employment. *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 567 (6th Cir. 2008). For instance, in *Osborne*, the Kentucky Supreme Court held that a priest providing marriage-counseling services was not acting within his "scope of employment" when he "engaged in an adulterous sexual relationship" with a married woman seeking counseling. 31 S.W.3d at 913, 915. The court reasoned that the priest "was not advancing any cause of the diocese or engaging in behavior appropriate to the normal scope of his employment." *Id.* at 915. Rather, "it [was] the abuse by the priest of his position" that caused him to "exceed[] the scope of his employment." *Id.* The court thus drew a distinction between marriage counseling, which was within the scope

---

[5] Tebault acknowledges that "transference in the psychological context has not been addressed by Kentucky courts, nor by the Sixth Circuit." (D.N. 20, PageID.336)

of the priest's employment, and a sexual relationship with a person being counseled, which was not. *Id.*

In a Sixth Circuit case applying *Osborne* to an insurance case, the court held that "a therapist's sexual affair with a patient [was] outside the scope of [his] employment as a matter of [Kentucky] law." *Scottsdale Ins. Co.*, 513 F.3d at 567. The court reasoned that Kentucky case law "strongly suggests that [Kentucky] would find such sexual activities not to be within a therapist's scope of employment." *Id.* ("[M]any Kentucky cases have held that sexual affairs are not within an employee's scope of employment."); *see, e.g.*, *Hall*, 74 S.W.3d at 692; *P.S. v. Meade Cnty. Baptist Temple*, No. 2006-CA-000155-MR, 2007 WL 491138, at *4 (Ky. Ct. App. Feb. 16, 2007); *Z.A. v. City of Louisville*, No. 2004-CA-001189-MR, 2005 WL 1491554, at *5 (Ky. June 24, 2005). Comparing the case to *Osborne*, the Sixth Circuit concluded that "[a] therapist's counseling of patients is not fundamentally different than a priest's counseling of married couples." *Id.* In making this finding, the Sixth Circuit stated that "it is hard to imagine any type of counseling position where having a sexual affair with a patient would be within the scope of employment." *Id.*

On the other hand, courts have consistently found other wrongful acts to be within the scope of an employee's employment where the employee had a business motive when engaging in the act. For instance, in *Patterson v. Blair*, the Kentucky Supreme Court held that an employee of a car dealership was acting within the scope of his employment when he shot out the tires of the plaintiff's truck to repossess the vehicle. 172 S.W.3d 361, 372 (Ky. 2005). In that case, because the car dealership sometimes repossessed cars, the court reasoned that the employee "was acting to further the business interests of [the dealership]" and "protect his employer's property." *Id.* The court stated that "most importantly, there [was] no evidence that [the employee] sought to

11

serve any personal purpose by his actions." *Id.* Similarly, in *Beinlein v. Kidz University*, the Kentucky Court of Appeals held that a daycare employee was acting within the scope of her employment when she assaulted children at the daycare. Nos. 2021-CA-1191-MR, 2021-CA-1248-MR, 2023 Ky. App. Unpub. LEXIS 469, *11 (Ky. Ct. App. Aug. 4, 2023). There, the employee was accused of "shoving, hitting, and cursing at the children," and "[v]ideo footage from the daycare later verified the abuse." *Id.* at *1. One video showed the employee grabbing a child by the arm, "push[ing] him to the floor," and saying, "I'm tired of you doing that type of stuff—sitting right on top of kids." *Id.* at *12. The court noted that "the relevant issue [was] [the employee's] motive, 'however misguided.'" *Id.* (quoting *Papa John's Int'l, Inc. v. McCoy*, 244 S.W.3d 44, 52 (Ky. 2008)). It held that a reasonable jury could "conclude that [the employee] believed she was disciplining children as part of her job." *Id.*; *see also Frederick v. Collins,* 378 S.W.2d 617 (Ky. 1964) (holding that a grocery-store employee acted within the scope of his employment when he shot and killed a patron believed to be conducting a holdup).

Consistent with the authority cited above, the Court concludes that Dawkins was not acting within the scope of her employment when she engaged in a sexual relationship with Tebault. First, the conduct was not "of the same general nature" as the conduct authorized or incidental to the conduct authorized. *See Osborne*, 31 S.W.3d at 915. As alleged in Tebault's amended complaint, Dawkins was a licensed social worker who provided Tebault with treatment and counseling in an equine-therapy program. (D.N. 13, PageID.98 ¶ 10) While treating Tebault, Dawkins "flirted with [Tebault]," "contacted him outside their treatment and counseling sessions," "initiated and pursued a romantic relationship with [Tebault]," "expressed her attraction to [Tebault]," and "continued to pursue an intimate, physical relationship with Tebault." (*Id.*, PageID.98–99 ¶¶ 10–11) Dawkins then "threatened to harm herself if the relationship ended." (*Id.*, PageID.99 ¶ 13)

12

Having a sexual relationship with Tebault would not have been authorized or incidental to the conduct authorized by the VAMC or the equine therapy program. *See Osborne*, 31 S.W.3d at 915; *Scottsdale Ins. Co.*, 513 F.3d at 567. On the contrary, such a relationship with a patient would have been a substantial deviation from her duties as a licensed social worker. *See Osborne*, 31 S.W.3d at 915. Nor is this conduct "expectable" in light of Dawkins's duties. *McMullan*, 2017 U.S. App. LEXIS 25273, at *6.

Moreover, Dawkins's sexual relationship with Tebault was not motivated by a business purpose; rather, it presumably followed from a purely personal purpose. *Scottsdale Ins. Co.*, 513 F.3d at 568 ("Engaging in sexual relations with a patient is not motivated by a desire to serve the interests of the therapist's employer, but rather, is designed 'to satisfy the employee's own sexual proclivities.'" (quoting *Hall*, 74 S.W.3d at 692)); *cf. Patterson*, 172 S.W.3d at 372. Lastly, the "substantial part" of the sexual relationship occurred outside of the "spatial and temporal limits" of her employment. *McMullan*, 2017 U.S. App. LEXIS 25273, at *6. Tebault and Dawkins had a months-long relationship. (D.N. 13, PageID.98–99) Their sexual relationship began in August 2021 and continued until January 2022. (D.N. 17-1, PageID.133) According to Tebault, Dawkins "frequently contacted" him outside of their counseling and therapy sessions. (D.N. 13, PageID.98 ¶ 10) The sexual relationship, however, did not begin until the equine-therapy program ended. (D.N. 17-2, PageID.144) Dawkins's sexual relationship with Tebault was therefore outside the scope of her employment as a counselor. *See McMullan*, 2017 U.S. App. LEXIS 25273, at *6. As in *Osborne*, it is the "abuse by [Dawkins] of [her] position that exceeds the scope of [her] employment." 31 S.W.3d at 915.

The Court thus also lacks subject-matter jurisdiction over Tebault's negligent treatment claims. *See Stout*, 721 F. App'x at 472; 28 U.S.C. § 1346(b)(1); *see also Flechsig v. United States*,

13

991 F.2d 300, 302–03 (6th Cir. 1993) (holding that a court lacks subject-matter jurisdiction in FTCA cases if the employee was acting outside the scope of their employment). Accordingly, the Court will grant the government's motion to dismiss. *See Stout*, 721 F. App'x at 472.

### III.

For the reasons set forth above, and the Court being otherwise sufficiently advised, it is hereby

**ORDERED** that the United States of America's motion to dismiss (D.N. 17) is **GRANTED**. This matter is **DISMISSED** for lack of subject-matter jurisdiction, **CLOSED**, and **STRICKEN** from the Court's docket.

March 31, 2025

David J. Hale, Judge
United States District Court

14